**H1 LAW GROUP**
Jill Garcia, NV Bar No. 7805
jill@h1lawgroup.com
701 N. Green Valley Parkway, Suite 200
Henderson, NV 89074
Phone  702-608-3720
Fax     702-703-1063

*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FEDERICO GARIBALDI, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>BOYD GAMING CORPORATION, a Nevada corporation; DOES I through X, inclusive; and ROE BUSINESS ENTITIES, I through X, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

Plaintiff Federico Garibaldi ("Plaintiff" or "Garibaldi"), by and through H1 Law Group, files this Complaint against Defendant Boyd Gaming Corporation ("Defendant" or "Boyd"), and states and alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. This is an action for damage brought by Plaintiff for unlawful workplace discrimination, failure to accommodate, and retaliation based on disability under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12101, *et. seq*. and Nevada Revised Statute §613.330, *et. seq*.; and for certain other claims brought pursuant to the Nevada Revised Statutes as outlined below.

2. Plaintiff Garibaldi is an individual residing in Nevada.

3. Defendant Boyd Gaming Corporation ("Boyd") is and was at all relevant times hereto, a corporation organized under the laws of the State of Nevada, with a principal place of business located in Las Vegas, Nevada.

1

4. Boyd employs 15 or more employees and is a "covered entity" within the meaning of the ADA. *Id.* § 12111(2), (5)(A).

5. All of the acts and/or failures to act alleged herein were duly performed by and/or are attributable to Defendant, individually or acting by and through its agents and employees. Said acts and/or failures to act were within the scope of any agency or employment or were ratified by Defendant.

6. The names and capacities, whether individual, corporate, associate or otherwise, of Defendant and/or its alter egos sued herein as DOES I through X, and ROE Business Entities I through X, inclusive, are presently unknown, and Plaintiff therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names of any and all Doe and Roe defendants as alleged herein and/or after their true names and capacities are ascertained.

7. This Court has primary jurisdiction over the claims set forth herein pursuant to 28 U.S.C. §1331 (federal question) because Garibaldi is making a claim under the ADA. Additionally, this Court has supplemental jurisdiction over any state law claims pled pursuant to 28 U.S.C §1367.

8. Venue is proper in this district because the Defendant's principal place of business is within this district and because the actions of Defendant at issue took place within this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDY

9. Plaintiff incorporates by reference all preceding allegations set forth in the Complaint as if fully stated herein.

10. On or about October 25, 2018, Plaintiff initiated the process of filing a Charge of Discrimination against his employer, the Defendant named in this action with the Nevada Equal Rights Commission, wherein he alleged discrimination based upon disability as well as alleging retaliation.

11. On or about May 6, 2021, the EEOC issued a Notice of Right to Sue.

12. This action is timely filed pursuant to 42 U.S.C. § 2000e-5(f).

2

13.     Plaintiff has exhausted his administrative remedy on all claims pled hereunder prior to filing this action with the Court.

## GENERAL ALLEGATIONS

*Garibaldi Is a Highly Qualified Analyst, and Is Hired by Boyd, Who Knew of His Hearing Disability*

14.     Plaintiff incorporates by reference all preceding allegations set forth in the Complaint as if fully stated herein.

15.     Garibaldi has more than seven years of experience with hospitality, healthcare and finance in the field of Information Technology as a Sr. Business Analyst, Sr. Systems Analyst, Quality Analyst, Test Lead and Quality Assurance Manager. He is experienced, among many talents, in authoring Business Required Documents ("BRD") and defining business processes, identifying risks, performing Gap analysis, feasibility analysis and impact analysis.

16.     In or around 2011, Garibaldi was diagnosed with hearing loss. From that time forward, Garibaldi was required to wear hearing-aids.

17.     Boyd is a casino gaming and hospitality company located in or around Las Vegas, Nevada.

18.     On or around June 26, 2017, Garibaldi accepted a position at Boyd as a Senior System Analyst, with a salary of $83,000 per year.

19.     During the hiring process, Garibaldi informed Boyd of his hearing disability.

20.     During the hiring process, Garibaldi disclosed to Boyd a description by his audiologist of his hearing loss.

21.     Boyd knew that Garibaldi was required to wear, and did wear, hearing-aids.

22.     Garibaldi informed Boyd that, due to his hearing disability, he could hear one-on-one conversations, but had difficulty hearing and understanding group conversations or meetings.

23.     Garibaldi was qualified for the position as a Senior System Analyst.

24.     His prior job experience included critically evaluating information gathered from multiple sources, reconciling conflicts, decomposing high-level information into details, working

3

with functional leads to transform and develop new requirements into successful design and implementation, interfacing with staff, and developing strategy as a technical Subject Matter Expert ("SME") for new functionality from key stakeholders regarding applications, releases, and upgrades.

25. Garibaldi's prior job experience also included autonomously interfacing with end users, stakeholders, vendors, and partners to design optimal solutions for integration with any application being considered.

26. Garibaldi was able to perform the essential functions of a Senior System Analyst at Boyd with or without a reasonable accommodation.

27. The essential functions of a Senior System Analyst, provided to Garibaldi at the time he was hired include, among others:

    a. Performs troubleshooting in the form of problem recognition, research, isolation, resolution, and follow-up;

    b. Performs root cause analysis and develops checklists;

    c. Analyzes, makes recommendations, creates charts, diagrams, and graphs to assist in analysis;

    d. Serves as a subject matter expert;

    e. Monitors, tunes, and optimizes system or application performance;

    f. Simulates or recreates problems to resolve operational deficiencies;

    g. Recommends procedures and controls for problem prevention;

    h. Develops and maintains problem databases;

    i. Designs systems, test plans and training programs;

    j. Develops Policies & Procedures ("P&P") and general standards;

    k. Leads implementations and rollouts;

    l. Leads post implementation audits;

    m. Interfaces with vendors regarding new product evaluation contract Terms & Conditions ("T&Cs") and troubleshooting issues;

    n. Researches new applications or technologies;

H1 LAW GROUP
701 N. Green Valley Parkway, Suite 200
Henderson, Nevada 89074
Tel: 702-608-3720



o. Develops, reviews, and approves technical documentation;

p. Prepares detailed functional specifications and coordinates Request for Proposal ("RFP") processes;

q. Performs resource and contingency planning with respect to technology applications; and

r. Serves as a subject matter expert as well as resource and lead to Systems Analysts I, II.

*Garibaldi Is Subject to Repeated Discrimination Based on His Hearing Disability*

28. Audrey Fredricks ("Fredricks") was a Manager of Solutions Engineering at Boyd and Garibaldi's day-to-day supervisor.

29. Marty Brunke ("Brunke") was a DEVOPS Manager at Boyd and Garibaldi's division supervisor.

30. On or around January 8, 2018, Fredricks conducted a review of Garibaldi's performance at Boyd for the last six months (approximately June 26, 2017 to December 31, 2017).

31. In this review, Fredricks rated Garibaldi as "Proficient."

32. On or around February 26, 2018, Fredricks and Brunke held a periodic review with Garibaldi.

33. At that time, Brunke accused Garibaldi of not listening.

34. Specifically, Brunke stated, "Well, you don't listen."

35. Garibaldi replied that he had a hearing-aid, alluding to his hearing disability.

36. Brunke replied, "Exactly."

37. The next day, on or around February 27, 2018, Garibaldi met with Yecenia Gonzalez ("Gonzalez"), Human Resources Representative, to discuss this meeting with Fredricks and Brunke, including the concerning comments made about his hearing disability.

38. On or around March 1, 2018, Garibaldi met with Gonzalez to submit a complaint against Brunke based on his discriminatory comments about Garibaldi's hearing loss.

39. Garibaldi was informed an investigation would take place.

40. Upon information and belief, Gonzalez notified Brunke about the complaint Garibaldi made against him.

41. Upon information and belief, Gonzalez notified Fredricks that Garibaldi felt he was being targeted by her.

42. On or around March 16, 2018, Christina Abernathy, Corporate Manager ("Abernathy"); Sandra Rodriguez, Relations Manager ("Rodriguez"); and Gonzalez held a meeting with Garibaldi.

43. At that time, Gonzalez informed Garibaldi that the issues with Brunke were addressed, but Gonzalez could not tell Garibaldi how they were addressed.

44. It appears from Gonzalez's notes of the investigation that nothing was done regarding Brunke's discriminatory comment about Garibaldi's hearing disability.

45. On or around April 17, 2018, Brunke and Fredricks held a meeting with Garibaldi in which his ability to listen was brought into question once again.

46. Brunke and Fredricks also questioned Garibaldi's intelligence.

47. Importantly, a hearing disability is not a mental deficiency, and it is discriminatory to treat a hearing-disabled person as unintelligent.

48. The next day, on or around April 18, 2018, Garibaldi emailed Gonzalez to report his concern about Brunke's and Fredricks' new discriminatory comments against his hearing disability.

**Brunke and Fredricks Unfairly Target Garibaldi**

49. On or around July 17, 2018, Garibaldi reported several issues to Gonzalez.

50. First, Garibaldi reported that Brunke made several personal negative comments against him.

51. Second, Garibaldi reported Brunke was creating a hostile work environment by intensely questioning everything Garibaldi did and never appreciating his work.

/ / /

6

52. To have ready answers for Brunke's intense scrutiny, Garibaldi kept detailed notes on everything he did, sometimes even digging through emails two to three months back.

53. Upon information and belief, no one else was scrutinized to this level.

54. Brunke's inappropriate scrutiny and negativity occurred despite Garibaldi being on call all day every day, without any overtime compensation, as Boyd's technology troubleshooting person.

55. Being on call like this was nowhere in Garibaldi's job description.

56. Yet, Brunke and Fredricks expected Garibaldi to be on call all day and still get all of his normal job duties done.

57. Garibaldi's on-call duties later changed to two-weeks on, two-weeks off, but still all day when he was on-call.

58. Despite this schedule, Brunke and Fredricks still made no allowances for Garibaldi's daytime workload.

59. Third, Garibaldi discussed with Gonzalez that Brunke filed a false report that Garibaldi had slammed his fists on his desk in anger.

60. This report was entirely false.

61. Fourth, Garibaldi discussed Brunke mentioning Garibaldi's hearing loss again and insulting his intelligence.

62. Finally, Garibaldi reported Brunke and Fredricks requiring him to file a weekly report to track every item with which he was tasked. No other employee in Garibaldi's group was required to do this.

63. Garibaldi told Gonzalez that he was worried he was being targeted by Brunke and Fredricks.

64. Gonzalez's notes state, "[i]t seems odd that he is the only one being asked" to track his tasks in such detail.

/ / /

/ / /

/ / /

7

***Despite Brunke and Fredricks' Intense Hostility, Garibaldi Provides Outstanding Services***

65. Despite this intense pressure and scrutiny from Brunke and Fredricks, Garibaldi continually provided excellent technology services to Boyd's employees.

66. For example, Beth Feix, Boyd's Coordinator for Promotions Programming, stated, "[Fred] is always quick to answer our skypes, calls and emails. If he doesn't have the answer, he finds the answer and gets back to us quickly. It really means a lot to have such great support as this job is new to almost every member of our team. Thanks Fred for all your assistance."

67. Bonnie Boyd, Boyd's Clerk for Direct Mail Marketing, stated, "Fred is always quick to respond and is always pleasant. He communicates well the status of the ticket; [sic] and is diligent in searching for answers that will resolve the issue at hand as quickly as possible. He is a pleasure to work with and always willing [to] answer questions."

68. Christine Olszewski, Boyd's Direct Marketing Campaign Supervisor, stated,

> I have had the pleasure of working with Fred for the past year as one of the key point people in the IT department regarding questions and issues encountered with Prizm. I, as well as the other co-workers in my department, know we can rely on Fred to answer questions in a timely manner and get our issues resolved as quickly as possible.
>
> Fred's work ethic is outstanding and any person that works with him can tell how much pride he has in his job role. He is a pleasure to work with, and his friendly attitude makes him approachable with any question that may arise. I feel he always goes above and beyond to try to get us answers and resolves our problems in a very thorough manner.
>
> Fred is truly an asset to any department that is lucky enough to work with him.

69. Danny Oh, Boyd's Manager of Direct Marketing Campaign, stated,

> Through this opportunity, I would like to thank you [Fred] for your continuous support and help for our Direct Marketing team. You always go above and beyond to investigate and resolve the issues we have with our systems (CMS, Prizm and etc[.]). Furthermore, you're always available for us to reach in case of [an] emergency. As you know, it is crucial in our industry as numerous urgent and emergency situations occur.
>
> Not only that, you provide us continuous updates and ETA so we can anticipate [sic]. Again, thank you for your willingness to help and looking forward to working with you even closely [sic]!

*Brunke and Fredricks Create Impossible Tasks for Garibaldi Based on His Hearing Disability*

70. In July 2018, Fredricks instructed Garibaldi to provide detailed notes of meetings he directed, or otherwise scribe meetings he was tasked with presenting.

71. Due to Garibaldi's hearing disability, this was an extremely difficult task.

72. It was very difficult for Garibaldi to lead meetings, listen to others, and take detailed notes because in group environments, Garibaldi had issues hearing everything that was said.

73. Brunke and Fredricks created this requirement for Garibaldi knowing that this task would be difficult for him based on his hearing disability.

74. Upon information and belief, no other presenters in the group were required to scribe and direct meetings besides Garibaldi—the only person with a hearing disability.

75. On or around July 25, 2018, Brunke emailed Gonzalez regarding Garibaldi, stating, "They do not want to salvage this team member, they want to eventually terminate."

76. On that same day, Brunke repeated this statement to Gonzalez at a meeting.

77. Brunke further stated he believed Human Resources was coddling Garibaldi.

78. Brunke's comments confirm that he and Fredricks had predetermined to force Garibaldi out of the company.

79. Brunke's comments further confirm that the issue of scribing during meetings was merely a pretext for setting Garibaldi up to fail, since Brunke and Fredricks knew Garibaldi would have difficulty accomplishing this task, without an accommodation, due to his hearing disability.

80. On or around July 30, 2018, Garibaldi requested, and was approved, to utilize a binaural (two-ear) headset during his work shift permanently.

81. On or around August 20, 2018, Fredricks and Brunke put together and placed Garibaldi on a Performance Improvement Plan.

/ / /

/ / /



82. A Performance Improvement Plan is a disciplinary strategy used in the company to document an employee's supposed failures and force the employee to change or be terminated.

83. Part of the Performance Improvement Plan against Garibaldi formalized the requirement that he provide detailed notes of meetings he led.

84. Thus, the Performance Improvement Plan was merely a pretext for forcing Garibaldi out of the company based on his hearing disability.

85. Notably, many of Garibaldi's supposed failures assessed in the Performance Improvement Plan were highly inaccurate, as evidenced by documentation later provided by Garibaldi to Boyd management and Human Resources.

86. On or around September 4, 2018, Garibaldi followed up with Fredricks regarding the requirement to scribe meetings he led. He informed Fredricks his hearing disability severely impeded his ability to complete this task.

87. On or around September 5, 2018, Fredricks, Brunke, and Abernathy met with Garibaldi.

88. In this meeting, Fredricks, Brunke, and Abernathy chided Garibaldi for not providing detailed meeting notes, as required by the Performance Improvement Plan.

89. Garibaldi again explained that he would need a reasonable accommodation to complete this task, because, due to his hearing disability, it was very difficult to hear everyone in the group and take detailed notes while also leading the meeting.

90. Garibaldi requested a recording device to record the meetings he led, a device that is very inexpensive.

91. Soon after, Garibaldi made a formal request for a recording device.

92. A few days later, Abernathy called Garibaldi into her office where she told him they would not approve his request for a recording device because they wanted to test whether he had the mental capacity to retain information.

93. As previously stated, a hearing loss is not a mental deficiency.

/ / /

10



94. Abernathy's comment was discriminatory against hearing-impaired individuals because Abernathy implied Garibaldi's hearing disability correlated with a mental deficiency.

95. Individuals with hearing loss can be smart, competent, and mentally capable of being Senior System Analysts.

96. At no time had Garibaldi ever suffered memory loss or any other mental deficiency.

97. Abernathy's comment about testing Garibaldi's memory, when taken together with Brunke's prior complaints about Garibaldi's inability to listen and Fredricks' and Brunke's pretextual requirement to scribe and lead meetings, shows a pattern of Boyd's managers attacking and discriminating against Garibaldi based on his hearing disability.

98. Abernathy refused Garibaldi's request for a reasonable accommodation despite knowing his hearing disability significantly impeded the task of scribing and leading meetings.

99. On or around September 13, 2018, Abernathy called Garibaldi into a meeting wherein she gave him two options, quit or be discharged.

100. She told Garibaldi that if he refused to quit, he would continue on the Performance Improvement Plan, which would likely lead to his termination.

101. Garibaldi replied that the Performance Improvement Plan was highly inaccurate.

102. Garibaldi also provided Abernathy with documents disputing the assessments in the Performance Improvement Plan.

103. Garibaldi refused to quit because he had been nothing short of a loyal and hardworking employee at Boyd and had done nothing wrong.

104. On or around October 4, 2018, Abernathy called Garibaldi into her office and discharged him.

***Nevada's Unemployment Office Finds Garibaldi Did Not Commit Misconduct Prior to His Termination***

105. Soon after his termination, Garibaldi applied for unemployment benefits with Nevada's Department of Employment, Training, and Rehabilitation ("DETR").

/ / /

106. Boyd opposed Garibaldi's unemployment benefits application claiming that he was fired for failing to complete tasks by their assigned deadlines.

107. Garibaldi asserted he completed all tasks except one which was delayed due to Boyd. Garibaldi provided documentation to substantiate his statements.

108. Based on the evidence, on or around October 18, 2018, DETR found, "[a]s it has not been shown your actions were deliberately negligent, *misconduct in connection with the work has not been established*." (emphasis added).

109. Thus, DETR determined Garibaldi was entitled to unemployment benefits.

*Nevada's Equal Employment Opportunity Commission Finds Reasonable Cause That Boyd Violated the ADA*

110. On or around October 25, 2018, Garibaldi filed a complaint with the Equal Employment Opportunity Commission ("EEOC").

111. After investigating Garibaldi's claims, EEOC issued a Letter of Determination on or around February 3, 2021.

112. In this letter, EEOC stated:

The Commission has considered all the evidence obtained during the investigation and finds that *there is reasonable cause to believe that Charging Party [Garibaldi] was denied a reasonable accommodation and subjected to unequal terms and conditions of employment due to his disability in violation of the ADA.*

113. On or around May 6, 2021, EEOC issued Garibaldi a right to sue letter.

*Garibaldi Suffered Mentally and Emotionally as a Result of Boyd's Discrimination*

114. Garibaldi suffered significant mental and emotional distress as a result of Boyd's discrimination and misconduct against his hearing disability.

115. Garibaldi was extremely embarrassed while working at Boyd when Brunke and Fredricks repeatedly criticized and disparaged his hearing and listening abilities.

116. Garibaldi experienced severe stress and anxiety while working at Boyd when Brunke and Fredricks criticized and disparaged his hearing and listening abilities, targeted him, intensely scrutinized his work, questioned his memory and intelligence, subjected him to

heightened standards of review not placed upon any other employee, and assigned him a task they knew was extremely difficult with his hearing disability—taking detailed meeting notes and leading meetings at the same time.

117. Garibaldi was forced to seek therapy for his severe and extreme emotional distress resulting from the conduct listed above, as well as from the aggressive and hostile work environment, which ultimately led to Garibaldi's unfair termination.

**CAUSES OF ACTION**

**COUNT I – Discrimination In Violation of the ADA and NRS 613.330**

118. Garibaldi incorporates by reference all preceding allegations set forth in the Complaint as if fully stated herein.

119. The ADA prohibits employers from interfering with an employee's rights under the ADA:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

120. NRS 613.330 prohibits discrimination on the basis of disability.

121. Boyd is a covered employer to which the ADA applies.

122. Garibaldi is disabled within the meaning of the ADA and NRS 613.330.

123. He has a substantial impairment to his hearing and is required to wear hearing aids.

124. Garibaldi had the requisite education, experience, and skills to perform the essential functions of a Senior Systems Analyst at Boyd.

125. Garibaldi was fully qualified and able to perform the essential functions of a Senior Systems Analyst with or without a reasonable accommodation.

126. Taking detailed notes while leading group meetings was not an essential function of a Senior Systems Analyst.

127. Even if it was an essential function, Garibaldi could have successfully performed this task with the reasonable accommodation of a recorder.

128. Boyd discriminated against Garibaldi because of his disability, initially requiring him to perform additional job duties others in similar positions were not required to do and then refusing to make accommodations to assist him in performing those responsibilities, making disparaging comments about his hearing loss and then, after refusing to accommodate him, ultimately terminating his employment.

129. Boyd, through its managers and directors, further discriminated against Garibaldi when it allowed Brunke, Fredricks, Gonzalez, and Abernathy to criticize Garibaldi's hearing and listening abilities, target him, intensely scrutinize his work, question his memory and intelligence, subject him to heightened standards of review not placed upon any other employee, and create a requirement that he scribe and lead meetings.

130. As a result of Boyd's actions, Garibaldi has suffered damages including lost wages (including back pay and front pay), lost employment, lost benefits, lost earning capacity, lost opportunities, emotional pain and suffering, inconvenience, mental anguish, and lost enjoyment of life in an amount to be proven at trial.

131. Boyd intentionally, voluntarily, deliberately, and willfully retaliated, discriminated, and terminated Garibaldi, and such actions were intentional, willful, malicious, and/or done with reckless disregard for Garibaldi's protected rights.

132. Due to Boyd's violations of the ADA and NRS 613.330, Garibaldi was forced to bring this action and is entitled to recover his attorney's fees and costs.

133. Further, Boyd violated the ADA and NRS 613.330 with an intent to injure Garibaldi or with a conscious disregard of his rights.

134. Garibaldi requests relief as described in the Prayer for Relief below.

**COUNT 2 – Failure to Accommodate in Violation of the ADA**

135. Garibaldi incorporates by reference all preceding allegations set forth in the Complaint as if fully stated herein.

///



136.  The ADA requires employers to provide reasonable accommodations to qualified applicants or employees.

137.  Garibaldi is disabled within the meaning of the ADA.

138.  He has a substantial impairment to his hearing and is required to wear hearing aids.

139.  Boyd, an ADA covered employer, had notice of his disability.

140.  With reasonable accommodation, Garibaldi would have performed what Boyd has deemed to be essential functions of the job.

141.  Yet, Boyd refused this reasonable accommodation to Garibaldi.

142.  Boyd, through its managers and directors, further failed to accommodate Garibaldi when it allowed Brunke, Fredricks, Gonzalez, and Abernathy to criticize Garibaldi's hearing and listening abilities, target him, intensely scrutinize his work, question his memory and intelligence, subject him to heightened standards of review not placed upon any other employee, and create a requirement that he scribe and lead meetings.

143.  These individuals knew Garibaldi would have difficulty in scribing and leading meetings due to his hearing disability and still refused to grant him a reasonable accommodation.

144.  In sum, Garibaldi was denied a reasonable accommodation and subjected to unequal terms and conditions of employment due to his hearing disability in violation of the ADA.

145.  Boyd failed to adequately supervise, control, discipline or otherwise penalize the conduct, acts, and failures of its employees and thereby ratified these wrongful actions.

146.  Garibaldi has suffered damages including lost wages (including back pay and front pay), lost employment, lost benefits, lost earning capacity, lost opportunities, emotional pain and suffering, inconvenience, mental anguish, and lost enjoyment of life in an amount to be proven at trial.

147.  Boyd intentionally, voluntarily, deliberately, and willfully retaliated, discriminated, and terminated Garibaldi, and such actions were intentional, willful, malicious, and/or done with reckless disregard for Garibaldi's protected rights.




H1 Law Group
701 N. Green Valley Parkway, Suite 200
Henderson, Nevada 89074
Tel: 702-608-3720

148. Due to Boyd's violations of the ADA, Garibaldi was forced to bring this action and is entitled to recover his attorney's fees and costs.

149. Further, Boyd violated the ADA with an intent to injure Garibaldi or with a conscious disregard of his rights.

150. Boyd's violations of the ADA constitute despicable conduct that subjected Garibaldi to cruel and unjust hardship with a conscious disregard of his rights.

151. Garibaldi requests relief as described in the Prayer for Relief below.

**COUNT III – Retaliation in Violation of the ADA and NRS 613.340**

152. Garibaldi incorporates by reference all preceding allegations set forth in the Complaint as if fully stated herein.

153. The ADA prohibits employers from retaliating against employees when engaging in protected activities:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

154. NRS 613.340 likewise prohibits retaliation on the basis of disability.

155. Garibaldi engaged in a protected activity when he reported, to Boyd's Human Resources department, on various occasions:

   a. Brunke and Fredricks' criticisms and disparaging remarks about his hearing loss and ability to listen;

   b. Brunke and Fredricks' disparaging remarks about his memory and intelligence;

   c. Brunke and Fredricks' intense scrutiny his work;

   d. Brunke and Fredricks requiring him to track in extreme detail every task assigned to him (a requirement of no other employee);

   e. Brunke and Fredricks demanding Garibaldi provide detailed notes about meetings he led (a requirement of no other employee);

16

    f.  Brunke and Fredricks placing Garibaldi on a Performance Improvement Plan that formalized the requirement to scribe and lead meetings; and

    g.  That Brunke and Fredricks' Performance Improvement Plan had wrongly assessed Garibaldi's job performance at Boyd as a pretext for treating Garibaldi negatively based on his hearing disability.

156. Garibaldi further engaged in a protected activity when he requested a reasonable accommodation of a recorder to address his hearing disability and help him complete the task of taking detailed notes of meetings he led.

157. Garibaldi also engaged in a protected activity when:

    a.  He opposed Abernathy's refusal to provide him a reasonable accommodation of a recorder;

    b.  He opposed Abernathy's disparaging statement that she wanted to test his memory (implying that hearing disabled people are mentally deficient); and

    c.  He gathered and provided significant documentation showing Abernathy that the Performance Improvement Plan wrongly assessed his job performance.

158. Boyd, through its managers and directors, took materially adverse actions and otherwise retaliated against Garibaldi for participating in these protected activities when:

    a.  Brunke and Fredricks intensely scrutinized Garibaldi's work (at a level which no other employee was subject);

    b.  Brunke and Fredricks required Garibaldi to track in extreme detail and report on every task assigned to him (a requirement placed on no other employee);

    c.  Brunke filed a false report with Human Resources alleging that Garibaldi struck his fists on his desk in anger;

///

///

17



H1 LAW GROUP
701 N. Green Valley Parkway, Suite 200
Henderson, Nevada 89074
Tel: 702-608-3720

  d. Brunke determined with Human Resources that they did "not want to salvage this team member [Garibaldi], they want[ed] to eventually terminate [him]";

  e. Brunke and Fredricks placed Garibaldi on an inaccurate Performance Improvement Plan, which was later enforced by Abernathy;

  f. Abernathy denied Garibaldi the reasonable accommodation of a recorder;

  g. Abernathy threatened Garibaldi to either quit or be fired; and

  h. Abernathy terminated Garibaldi.

159. The above listed materially adverse employment actions would deter a reasonable person from engaging in activity protected under the ADA and NRS 613.340.

160. Boyd failed to adequately supervise, control, discipline or otherwise penalize the conduct, acts, and failures of its employees and thereby ratified these wrongful actions.

161. Boyd's material adverse actions would not have occurred but for the retaliation.

162. Garibaldi has suffered damages including lost wages (including back pay and front pay), lost employment, lost benefits, lost earning capacity, lost opportunities, emotional pain and suffering, inconvenience, mental anguish, and lost enjoyment of life in an amount to be proven at trial.

163. Boyd intentionally, voluntarily, deliberately, and willfully retaliated against, discriminated against, and terminated Garibaldi, and such actions were intentional, willful, malicious, and/or done with reckless disregard for Garibaldi's protected rights.

164. Due to Boyd's violations of the ADA and NRS 613.340, Garibaldi was forced to bring this action and is entitled to recover his attorney's fees and costs.

165. Further, Boyd violated the ADA and NRS 613.340 with an intent to injure Garibaldi or with a conscious disregard of his rights.

166. Boyd's violations of the ADA and NRS 613.340 constitute despicable conduct that subjected Garibaldi to cruel and unjust hardship with a conscious disregard of his rights.

167. Garibaldi requests relief as described in the Prayer for Relief below.

/ / /

## COUNT IV - Intentional Infliction of Emotional Distress

168. Garibaldi incorporates by reference all preceding allegations set forth in the Complaint as if fully stated herein.

169. Boyd's conduct was extreme and outrageous when it allowed its directors and managers to criticize and disparage Garibaldi's hearing and listening abilities; target him; intensely scrutinize his work; question his memory and intelligence; subject him to heightened standards of review not placed upon any other employee; create an extremely difficult requirement for Garibaldi—namely to scribe and lead meetings—knowing it was difficult to complete this task based on his hearing disability; refuse to grant Garibaldi a recorder as a reasonable accommodation; and terminate Garibaldi based on his hearing disability.

170. Boyd, through its managers and directors, intended to cause emotional distress to Garibaldi or acted with reckless disregard of causing him emotional distress.

171. Garibaldi suffered severe or extreme emotional distress as a result of Boyd's conduct including, but not limited to, severe or extreme emotional pain and suffering, inconvenience, mental anguish, and lost enjoyment of life.

172. Boyd's acts and or omissions were taken with an intent to injure Garibaldi or with a conscious disregard of his rights.

173. Boyd's acts also constitute despicable conduct that subjected Garibaldi to cruel and unjust hardship with a conscious disregard of his rights.

174. Garibaldi requests relief as described in the Prayer for Relief below.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, as follows:

1. For damages, the full amount to be determined at trial;
2. For punitive damages in an amount to be determined at trial;
3. For attorney's fees and costs as may be recoverable in connection with this suit; and,

4.      For such other and further relief as this court deems just and equitable.

Dated this 3rd day of August 2021.

          H1 LAW GROUP

*/s/ Jill Garcia*
Jill Garcia, NV Bar No. 7805
jill@h1lawgroup.com
701 N. Green Valley Parkway, Suite 200
Henderson, NV 89074

*Attorneys for Plaintiff*